UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:17-CV-19-TBR

GEORGE DANIEL,                                                                    PLAINTIFF

v.

LINDSAY HARPER, et. al.,                                                     DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court upon four separate motions. First, Plaintiff George Daniel ("Plaintiff") has filed two Motions for Summary Judgment: one against Defendants Matthew Johnston ("Johnston") and Lindsay Harper ("Harper"), [DN 30], and a second one against Defendant Bradley Boyd ("Boyd"). [DN 31.] Next, Johnston and Harper have filed a Motion for Summary Judgment. [DN 32.] Lastly, Boyd has filed a Motion for Summary Judgment. [DN 35.] These matters are ripe for adjudication. For the following reasons, Harper and Johnston's Motion is **GRANTED**, Boyd's Motion is **GRANTED**, and Plaintiff's Motions are **DISMISSED AS MOOT**.

## I. Background

Johnston is a nurse practitioner, employed by Advanced Correctional Healthcare, Inc. [DN 32-1, at 1 n. 1.] Harper is a nurse, employed by the same company. [*Id.*] Advanced Correctional Healthcare, Inc. has a contract with Christian County to provide medical services to inmates at the Christian County Jail. [*Id.*] Defendant Boyd is the Christian County Jailer. Plaintiff is an inmate at the Christian County Jail. [DN 1, at 1.] Prior to his incarceration there, Plaintiff apparently had a long history of back problems. [*Id.* at 4.] In his Verified Complaint, Plaintiff avers that he suffers from "severe degenerative disc disease," as well as disc herniation.

1

[*Id.*] According to Plaintiff, he has had four screws, a rod, and a metal plate surgically implanted into his back. [*Id.*]

The impetus of Plaintiff's case is that Defendants (1) have failed to provide him with adequate medical care, (2) have failed to provide him with adequate shelter, and (3) have acted negligently in treating or otherwise responding to his back problems. Specifically, Plaintiff avers that his Eighth Amendment right to be free from cruel and unusual punishment was violated in two separate ways.[1] First, Plaintiff avers that Defendants repeatedly failed to see Plaintiff, prescribe him appropriate medication, refer him to a back specialist, take x-rays of his back, or recommend that he get surgery. [*Id.* at 4-5.] He further avers that they acted negligently in failing to do the same. [*Id.* at 5.] Second, Plaintiff avers that all three Defendants are liable under the Eighth Amendment for failing to provide him with adequate shelter during his time at the Christian County Jail. To that end, Plaintiff avers that upon his intake at the Jail, he was only given a thin mat and was assigned to a top bunk, despite his back problems. Plaintiff has moved for summary judgment in two separate Motions: one seeks summary judgment as against Boyd, and the other as against both Harper and Johnston. Likewise, Boyd has independently filed a Motion for Summary Judgment, and Harper and Johnston have moved jointly.

## II. Legal Standard

Summary Judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Importantly, "not every issue of fact or conflicting inference presents a genuine issue of material fact." *Street*

---

[1] It should be noted here that, although Plaintiff purports to bring his deliberate indifference claims under the Eighth Amendment, it appears that at all relevant times, Plaintiff was a pretrial detainee. Thus, his claims actually arise under the Fourteenth Amendment. *See Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013). The analysis is the same under either Amendment.

*v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). Rather, the test is whether the party bearing the proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 796, 799 (6th Cir. 1996). This means that the plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for plaintiff. *Id.* Mere speculation will not suffice, because "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). In determining whether summary judgment is warranted, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Defendants' Motions for Summary Judgment

All three Defendants have moved for summary judgment: Johnston and Harper jointly, and Boyd separately. Both Motions put forth the primary argument that Plaintiff's claims are barred by the Prison Litigation Reform Act, on the basis that he failed to exhaust his administrative remedies and failed to show an actual injury.[2] Defendants argue further that, even if Plaintiff exhausted his administrative remedies and can show actual injury, he still cannot show a serious medical need or deliberate indifference on the part of Defendants. Boyd further argues that he is entitled to immunity. Finally, all three Defendants argue that Plaintiff cannot establish a prima facie case of common law negligence. Due to the fact that the arguments advanced by all Defendants track each other very closely, the Court will address the Motions together by issue.

---

[2] Due to discrepancies between the grievance policy cited by Defendants and the one cited by Plaintiff, the Court ordered all parties to further brief this issue. Those briefs are laid out in the docket at DN 44, 45, 46, and 47.

**A. Prison Litigation Reform Act**

The Prison Litigation Reform Act of 1995 ("PLRA") mandates that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined by any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This means that, before prisoners may seek legal redress for alleged violations of their Federal rights in court, it is mandatory that they exhaust all administrative remedies first. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). Importantly, "the PLRA exhaustion requirement requires proper exhaustion," meaning "compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 91-93 (2006). Lastly, complete exhaustion of administrative remedies is required even where the administrative process available to the prisoner cannot provide him with the precise relief he seeks. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

> According to Defendants, the Christian County Jail grievance policy is as follows:
>
> Any prisoner shall be allowed to file a grievance at such time as the prisoner believes he or she has been subject to abuse, harassment, abridgment of civil rights or denied privileges specified in the posted rules. (Grievances must be restricted to incidents which occur while the prisoner is in custody of the center.) No prisoner shall fear against reprisal for initiating grievance procedure in an attempt to resolve legitimate complaints.

501 KAR 3:140, § 7. [*See* DN 40-1, at 1.] In addition to this general description of the Jail's grievance policy, there are also detailed procedures, which lay out the manner in which prisoners should go about filing such grievances. This includes how to fill out grievance forms, what they should contain and, of particular importance to the instant Motions, the appeals process. Specifically, the Jail's grievance policy provides the following: "If not satisfied with the

disposition of the grievance by the Jailer, the inmate shall be furnished paper, pencil, and an envelope in order to set forth his grievance in writing and his objection to the disposition of the grievance. The inmate's appeal letter will then be forwarded to the Department of Corrections." [*Id.* at 2.]

The primary contention laid out in the Motions submitted by Harper and Johnston and by Boyd is that Plaintiff failed to exhaust his administrative remedies within the Christian County Jail and, as a result, the Court must dismiss Plaintiff's claims. There is some disagreement as to when Plaintiff filed his first grievance, and how many grievances he has filed to date. Boyd claims in his Motion for Summary Judgment that "[t]he first grievance [Plaintiff] provided to Jailer Boyd was on February 21, 2017…[and] was filed after [Plaintiff] filed his Complaint on February 17, 2017. [DN 35-1, at 7.] Conversely, Plaintiff contends that his first grievance was filed on February 2, 2017. [*See* DN 23-1, at 20.] Johnston and Harper appear to agree with Plaintiff's timeline. [*See* DN 32-1, at 5.] This would place the filing of his first grievance *before* the filing of his Verified Complaint, making it relevant.

However, the crucial issue is not the precise date on which Plaintiff filed his grievance, nor is it how many grievances he has filed. Rather, the dispositive question in the PLRA exhaustion analysis is whether, upon filing such a grievance or grievances, Plaintiff exhausted the avenues of relief within the administrative system available to him in the Jail, or whether he failed to do so. As described above in the Jail's policy and procedure for filing and appealing grievances, an inmate's avenues are not exhausted unless and until the inmate appeals an adverse decision from the initial grievance. Assuming that Plaintiff's first grievance is correctly dated, and was therefore submitted on February 2, 2017, this is the only relevant grievance. This is because all remaining grievances that have been filed with Court by Plaintiff and Defendants

were dated *after* the commencement of this lawsuit, and so do not apply towards the exhaustion requirement here. *See* 42 U.S.C. § 1997e (explaining that administrative remedies must be exhausted *before* an inmate may file a lawsuit in federal court).

Plaintiff filed the February 2 grievance with the Court, which is addressed to a "Cpl. Howard," as well as to Boyd. [DN 23-1, at 16.] In it, Plaintiff details what he perceives to be the inadequate medical care he was receiving at the time. Boyd claims that he "never received a grievance from [Plaintiff] dated February 2, 2017, as indicated by [Plaintiff] and provided during the course of discovery." [DN 35-1, at 7.] Boyd goes on to argue, though, that even assuming that this February 2 grievance was properly filed, Plaintiff never received Boyd's response and never inquired after it, nor did he file an appeal, as required by Jail policy. [*Id.* at 7-8.] Likewise, Johnston and Harper argue that Plaintiff "did not file an appeal to any of the grievances he submitted. He has not produced any evidence that he filed appeals." [DN 32-1, at 8.] In his Response, Plaintiff argues that he wrote out grievances, placed them in an envelope, properly addressed them, and placed them "on [the] outside window ledge for deputies to pick up and take to the persons addressed…." [DN 37, at 2.] However, Plaintiff goes on to state that "[n]o grievance that was filed was answered!" [*Id.*] Plaintiff does not dispute Defendants' argument that he did not actually appeal this or any other grievance. As explained in Boyd's reply, "[d]espite his admitted familiarity with the [grievance] procedure, [Plaintiff] does not dispute his failure to appeal any grievance, or lack of response as he alleges, to the Department of Corrections." [DN 38, at 1-2.]

In response to Defendants' argument, Plaintiff's principle retort regarding the grievance policies and procedures is that the exact process by which inmates at the Jail are to file and appeal grievances is not adequately posted throughout the Jail. [*See* DN 37, at 2, Plaintiff

explaining that "[t]here are no grievance procedures posted in all 'cell' or living area," and that "no inmate is given a paper about grievance procedures."] Notwithstanding this, "[s]ection 1997e(a) says nothing about a prisoner's subjective beliefs, logical or otherwise, about the administrative remedies that might be available to him. The statute's requirements are clear: If administrative remedies are available, the prisoner must exhaust them." *Brock v. Kenton County, Kentucky*, 93 F. App'x 793, 798 (6th Cir. 2004). Moreover, "[a] plaintiff's failure to exhaust cannot be excused by his ignorance of the law or the grievance policy." *Napier v. Laurel County, Kentucky*, 636 F.3d 218, 221n.2 (6th Cir. 2011) (citing M*olina-Crespo v. United States Merit Sys. Prot. Bd.*, 547 F.3d 651, 662 (6th Cir. 2008)) ("[E]ven in civil suits, ignorance of the law does not excuse the failure to follow it."). Thus, any lack of subjective knowledge on the part of Plaintiff as to how or when to go about filing an appeal with respect to the February 2 grievance is immaterial, in and of itself, with respect to the exhaustion question.

Plaintiff's final argument with respect to his lack of knowledge regarding the appeals process revolves around the Christian County Jail's inmate handbook. Specifically, while Boyd, Johnston and Harper cite to one written policy as controlling the grievance process in the Jail, [*see* DN 32-33, DN 35-23], Plaintiff cites to different language that he contends is in the inmate handbook. [*See* DN 40-1, at 4.] The photocopied exhibit to which Plaintiff cites provides as follows:

> 1. Any inmate will be allowed to file a grievance if he/she believes he/she has been subjected to abuse, harassment, a violation of civil rights or has been denied privileges without justification.
> 2. Such grievances shall be in written form on any type of paper, addressed to the Jailer and sealed in an unstamped envelope or handed [to] jail staff.
> 3. An inmate shall not fear against reprisal from initiating grievance procedures in an attempt to resolve legitimate complaints.

[*Id.*] Noticeably absent from this language is information regarding the appeals process for grievances. As the Supreme Court has noted, an inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). "Unavailability" exists in three situations: first, when the grievance procedure "operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, unavailability exists where the "administrative scheme…[is] so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," unavailability exists. *Id.* at 1860.

It is this question of "unavailability" and the discrepancy between the policy to which Plaintiff cites and the one to which the Defendants cite that the Court ordered briefed more fully by both parties. [*See* Parties' Briefs, DN 44-47.] In this Court's Order requiring such briefing, the parties were apprised of the fact that "there appear[ed] to be some confusion as to the proper grievance process, whether and where this process is posted and/or available in the Christian County Jail, and whether the inmate handbook provides incomplete information regarding the grievance process." [DN 43, at 2.] The Court went on to explain that, "given that there is a great deal of confusion as to the actual grievance process and, more importantly, its actual availability to Daniel, the Court will order both sides to brief this issue more fully before it rules…." [*Id.* at 3.] In his Brief, Boyd remarks that "[t]here is a discrepancy between the Christian County Jail's Policy and Procedure Manual and the inmate handbook. The discrepancy is the omission of the provision for an appeal from the inmate handbook while the Policy and Procedure Manual contains an appeal provision." [DN 44, at 1.] However, Boyd does not explain why that is the

case, or whether inmates are informed of the right to appeal, and how to go about accomplishing that procedurally. In their Brief, Johnston and Harper present an alternative argument in lieu of discussing the discrepancy: "Regardless of whether the appeal process was available or not, it is clear that the first step of the grievance process was available to Plaintiff…[and] his first grievance did not state with sufficient particularity so as 'to allow prison officials a fair opportunity to address grievances on the merit, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court.'" [DN 45, at 5-6 (quoting *Mattox v. Edelman*, 851 F.3d 583, 591 (6th Cir. 2017).]

Plaintiff does not explicitly argue any of the Supreme Court's variations on unavailability. Rather, where Defendants claim that a grievance policy complete with the appeals process is in force at the Christian County Jail, Plaintiff argues that his inmate handbook makes no mention of the appeals process, its availability, or its required use for exhaustion purposes. The issue of a discrepancy regarding whether an appeals process is available to inmates is not an issue that has been heavily litigated. However, looking outside the Sixth Circuit, this Court finds guidance that indicates that the appeals process was likely "unavailable" to Plaintiff. In *Lassiter v. Sherrer*, the District Court for the District of New Jersey noted that it was compelled to "find for plaintiff on this issue because the record does not explain the appeals procedure in place at the time plaintiff filed his grievance form. Defendants have provided a copy of the 'Grievance Procedure' section of the Northern State Prison Inmate Handbook….The Handbook does not discuss details of how or whether an inmate may appeal an adverse response to a [grievance]." *Lassiter v. Sherrer*, No. 09-2979, 2011 WL 4594203, at *4 (D. N.J. Sept. 30, 2011). Likewise, the District Court for the Southern District of Indiana denied summary judgment to the defendants against an inmate where the jail "inmate handbook [did] not contain a provision that

an appeal may be filed within a certain time period if no response is received." *Britt v. Rahana*, No. 1:13-cv-01795, 2014 WL 1871018, at *2 n. 3 (S.D. In. May 8, 2014). Also, the Southern District of New York has explained that, where statements of correctional facility employees were inconsistent with the language of the inmate handbook, "[t]his apparent discrepancy may plausibly explain why the plaintiff was unable to exhaust his administrative remedies. If the correctional facility did not inform inmates that there was a 5-day filing deadline, but then rejected the plaintiff's initial grievance for failing to meet that filing deadline, this may call into doubt the availability of his administrative remedies…." *Ferguson v. Bizzario*, No. 09 Civ. 8106, 2010 WL 4227298, at *6 (S.D. N.Y. Oct. 19, 2010); *see also Woodruff v. Melton*, No. 2:13-cv-0085, 2015 WL 5774454, at *5 (M.D. Tenn. Sept. 30, 2015) (Sixth Circuit District Court explaining that, "absent evidence that the…grievance procedure is set forth in an inmate handbook, or some other jail publication available to prisoners, an option to appeal printed on the bottom of a grievance form might be viewed in some quarters as falling short of a 'procedural rule' that plaintiff was required to follow.").

Here, Plaintiff has attached documentation indicating that the inmate handbook which was provided to him does not include a provision detailing how the appeals process works or the deadlines relevant to filing such an appeal. Indeed, it does not instruct inmates that an appeal is a remedy available to them at all. This appears to be bolstered by Boyd's Brief, [DN 44], wherein he admits that "[t]here is a discrepancy between the…Jail's Policy and Procedure Manual and the inmate handbook. The discrepancy is…the omission of the provision for an appeal from the inmate handbook…." [*Id.* at 1.] And neither Boyd nor Harper and Johnston indicated in their Briefs that inmates are apprised of the appeals process in some other manner, such as bulletin boards or supplemental documents not included in the Inmate Handbook. The issue is not

whether there actually *is* an appeals process; it is relatively clear to the Court that inmates are technically able to appeal adverse decisions from grievances they have filed. Rather, the issue is the availability of the appeals process. And from the filings in this case and the case law detailed above, the Court cannot rule as a matter of law that Plaintiff failed to exhaust remedies that do not appear to have been available to him at the time. There is a difference between an inmate's lack of knowledge about the appeals process and documentation given to him which misrepresents that process.

### B. Plaintiff's Fourteenth Amendment Deliberate Indifference Claim

### 1. Johnston & Harper's Argument

In addition to their failure-to-exhaust argument, laid out above, Defendants Harper and Johnston also argue that summary judgment in favor of them on Plaintiff's claim of deliberate indifference for a denial of adequate medical treatment is appropriate for two reasons. They contend Plaintiff has (1) failed to establish a serious medical need, and (2) that he cannot establish that any potential serious need was caused by a constitutional violation. [DN 32-1, at 9.]

As noted above, while Plaintiff purports to have brought his deliberate indifference claim under the Eighth Amendment, at all relevant times, it appears that he was a pretrial detainee. As such, the proper analysis falls under the Fourteenth Amendment. *See Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (explaining that "[t]he Fourteenth Amendment's Due Process Clause governs such [deliberate indifference] claims presented by pretrial detainees, but 'are analyzed under the same rubric as Eighth Amendment claims brought by prisoners.'").

"The deliberate indifference to serious medical needs of prisoners—e.g., the failure to respond to medical needs, intentional denial or delay of medical care, or intentional interference with a prescribed treatment—constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). In analyzing a deliberate indifference claim under the Fourteenth Amendment, as under the Eighth Amendment, the court "employ[s] a two-prong test with objective and subjective components…." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The first question is "whether the plaintiff had a "sufficiently serious medical need under the objective prong." *Id.* (internal quotation marks and citations omitted). "A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment." *Id.* (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004)). Next, the determination must be made "whether the defendant had a sufficiently culpable state of mind in denying medical care under the subjective prong." *Id.* (internal quotation marks and citations omitted).

Importantly, "[t]here must be a showing of more than mere negligence," but the requirement is "something less than specific intent to harm or knowledge that harm will result…." *Id.* (citing *Farmer*, 511 U.S. at 835). This means that "[t]he defendant must have '[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs.'" *Id.* (quoting *Blackmore*, 390 F.3d at 896). And "[w]here the plaintiff has received some medical treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Id.* (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

In the present case, Harper and Johnston claim that Plaintiff cannot establish a sufficiently serious medical need such that would implicate the Fourteenth Amendment. [DN 32-1, at 10-11.] Harper and Johnston describe Plaintiff's back issues as "back pain," and "[a] common, non-life threatening condition[, which] does not give rise to a serious medical need." [*Id.* at 11.] However, even setting aside the argument regarding the seriousness of Plaintiff's back injury and condition, the Court finds that Plaintiff has not produced more than a scintilla of evidence pertaining to any deliberate indifference by Harper and/or Johnston under the subject prong of the two-part inquiry. As a result, summary judgment in favor of these defendants is appropriate.

As the Supreme Court has noted:

> individuals cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of and disregards* an excessive risk to inmate health….[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. Harper and Johnston argue that "[t]here is nothing in the record that even suggests the Defendants knew of and disregarded [any such]…substantial risk of serious harm." [DN 32-1, at 12.] Plaintiff averred in his Verified Complaint that he "made numerous attempts to see the jail physician through medical slips to Mrs. Harper to no avail." [DN 1, at 5.] However, Plaintiff's own discovery filings contradict this and show Medical Progress Notes filled out on twelve different occasions from May 12, 2016 to February 21, 2017 when Plaintiff was seen for problems relating to his back.[3] [*See generally* DN 25.] Plaintiff goes on to aver in his Verified Complaint that "Johnston flat out refused to see me or refer me to a back specialist

---

[3] These twelve occasions only relate to when Plaintiff was seen for his back troubles. Plaintiff filed numerous other medical report forms from times he was seen by staff for mental health care. The occasions on which Plaintiff was seen with respect to his back troubles, according to Plaintiff's discovery filings were, in 2016: May 12, May 31, June 29, July 1, July 5, July 10, July 21, September 9, September 13; in 2017: February 3, February 7, February 21.

to [address] my medical needs." [*Id.*] Again, Plaintiff's own records indicate he was seen at the Jail's medical facility at least twelve times for his back troubles. Thus, by Plaintiff's own filings, it is clear to the Court that any allegations or averments which allude to the notion that Plaintiff was not seen by medical staff, or was refused treatment, are unfounded and contrary to Plaintiff's own evidence.

The heart of Plaintiff's Verified Complaint, though, is that when he was seen by Jail medical staff, he was provided with *inadequate* treatment. "[W]here a 'deliberate indifference claim is based on a prison's failure to treat a condition *adequately*' or on 'a determination by medical personnel that medical treatment was unnecessary,' a plaintiff must 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'" *Cobbs v. Pramstaller*, 475 F. App'x 575, 580 (6th Cir. 2012) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897-98 (6th Cir. 2004)). Plaintiff avers in his Verified Complaint that he "made several attempts to see the jail physician through medical slips to Mrs. Harper to no avail," and that "Mr. Johnston flat out refused to see [him] or refer [him] to a back specialist…." [DN 1, at 5.]  As noted above, Plaintiff's own discovery filings with the Court directly refute these notions. As to Plaintiff's averment that Johnston refused to refer him to a back specialist, the Court is want to interfere with a medical professional's judgment on matters pertaining to the diagnosis, course and plan of treatment, and other issues that fall squarely within the realm of medicine. Indeed, the Supreme Court has explicitly stated that "the question of whether an x-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107.

In *Estelle*, the Supreme Court specifically noted the fact that the plaintiff, Gamble, "was seen by medical personnel on 17 occasions spanning a 3-month period," during which time medical professionals "treated his back injury," among other ailments. *Id.* In the end, Gamble's claim was "based solely on the lack of diagnosis and inadequate treatment of his back injury...." *Id.* However, "[t]he doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers. Respondent [Gamble] contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued." *Id.*

Here, as in *Estelle*, Plaintiff was seen many times throughout an extended period of time. By Plaintiff's own discovery filings, he was seen by a medical professional for back problems at least a dozen times. Moreover, many of the dates on the Medical Progress Notes closely track the Sick Call Request forms Plaintiff filled out asking for treatment. For example, Plaintiff filled out Sick Call Request forms on May 9 and May 11, 2016, and was seen on May 12; he filled out a form on May 30 and was seen on May 31; he filled out a form on June 12 and was seen on June 29, July 1, July 5, and July 10; he filled out a form on July 20 and was seen on July 21; he filled out sequential forms on September 6, 7, and 8 and was seen on September 9 and September 13; finally, he filled out a form on February 1, 2017 and was seen on February 3 and February 7. [*See* DN 25.] Thus, Plaintiff's own filings demonstrate the apparent attentiveness with which medical employees responded to his Sick Call Request forms. In this case, as in *Estelle*, Plaintiff's Verified Complaint basically boils down to one that inadequate treatment was provided for his back injury. Like Gamble, Plaintiff "contends that more should have been done by way of diagnosis and treatment, and suggests…options that were not pursued." *See Estelle*, 429 U.S. at 107. However, "the question of whether…additional…forms of treatment" were

available to Johnston and Harper, which, in their judgment were not to be implemented, "is a classic example of a matter for medical judgment." *See id.*

The numerous Medical Progress Notes indicate that Harper, Johnston, or other medical professionals who worked at KSP during the relevant time period prescribed different pain relievers to Plaintiff over the course of several months. Indeed, these documents paint a picture of medical professionals trying different medications to alleviate Plaintiff's back pain: on May 12, he was prescribed Indocin; on May 30 he was prescribed Meloxicam; in July he was prescribed Indocin and Prednisone and instructed as to relaxation techniques for his back; in September he was prescribed Mobic and Prednisone; and in February he was prescribed Prednisone and Neurontin. [*See* DN 25.] Plaintiff took issue with the fact that, after one visit to the medical facility, he was apparently instructed that, should he wish additional pain medication, he could purchase Tylenol from the commissary at the Jail. [*See* DN 28, at 4.] There is a Medical Progress Note indicating that Plaintiff was so instructed on July 21, 2016, but this was only two weeks after he had been prescribed both Indocin and Prednisone.

In short, Plaintiff's principle problem with Harper and Johnston appears to be the precise manner in which they provided medical care to him with respect to his back troubles because the medication being provided to him throughout 2016 and into 2017 was not adequate in Plaintiff's view, and he believes that surgery was required. He accuses them of having "no clue what is wrong with plaintiff's back because they are not qualified to make a diagnosis on his back." [*Id.*] But, as noted above, the Court is want to interfere in the often-tricky process of medical diagnoses and treatment plans and schedules. In light of the fact that Plaintiff has presented nothing more than a disagreement, albeit a strong one, regarding the appropriate course of treatment for his back, this cannot as a matter of law rise to the level of "cruel and unusual

punishment" as required under the Eighth and Fourteenth Amendments. Plaintiff has presented no evidence tending to show that Harper and/or Johnston were both aware of a serious medical condition and acted with deliberate indifference to prevent, impede, or otherwise deny Plaintiff sufficient medical care. As the Sixth Circuit has made abundantly clear, liability under this claim requires "more than mere negligence." *Burgess*, 735 F.3d at 476 (citing *Farmer*, 511 U.S. at 835). Thus, even supposing that any medical diagnoses or courses of treatment decided upon by Harper and/or Johnston could be construed as at all negligent, Plaintiff still has not produced any evidence that would lead this Court to decide that the dispute is anything more than one over the preferred treatment plan. *See Koos v. Corrections Corp. of Am.*, 63 F. App'x 796, 797 (6th Cir. 2003) (explaining that a plaintiff's "dissatisfaction with his treatment does not state a claim under the Eighth Amendment."). Summary judgment in favor of Harper and Johnston on Plaintiff's deliberate indifference claim is appropriate.

### 2. Boyd's Argument

The Court has also determined that summary judgment in favor of Boyd on Plaintiff's deliberate indifference claim is appropriate. In Plaintiff's Verified Complaint, the only mention he makes of Boyd is in the following averment: "I [Plaintiff] filed a grievance to Jailer Boyd to seek help and nothing was done." [DN 1, at 5.] Crucially, there is only one grievance at issue, and it is dated February 2, 2017. [DN 23-1, at 16.] This means that the singular grievance at issue was filled out by Plaintiff only thirteen days before he filed this lawsuit in federal court (February 15, 2017). Sequentially, the next grievance in Plaintiff's discovery filings is dated February 21, 2017, six days after this lawsuit was commenced and, as a result, irrelevant to this case.

The February 2 grievance is addressed to a "Cpl. Howard" as well as to Boyd. [*Id.*] In the grievance, Plaintiff explains that he has made several attempts to see a Jail physician to no avail, that his back is in "excruciating pain" and has been his entire stay at the Christian County Jail. [*Id.*] He then details a small portion of his medical history and suggests that he needs surgery to correct the problem. [*Id.*] Next, Plaintiff complains of having been assigned a top bunk, as his back troubles make it difficult and uncomfortable to climb up and down. [*Id.*] He concludes by stating that he is being denied adequate medical care and would appreciate Boyd alleviating the problem. [*Id.* at 17.] This grievance, without anything else, is woefully insufficient to establish more than a scintilla of evidence that Boyd violated Plaintiff's constitutional rights under the Fourteenth Amendment. There is no indication, and Plaintiff does not provide any evidence showing, that Boyd had any knowledge of Plaintiff's medical condition before the February 2 grievance, and Boyd even disputes ever receiving this grievance. [*See* DN 35-1, at 7 ("Jailer Boyd never received a grievance from Mr. Daniel dated February 2, 2017…[and] Mr. Daniel offers no proof Jailer Boyd received or should have received the…grievance.").]

As stated above, the subjective component of the analysis demands that the defendant have acted with a subjective "state of mind…[evidencing] deliberate indifference." *Koos*, 63 F. App'x at 797 (citing *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991)). Plaintiff has not produced any evidence of Boyd's state of mind being that of deliberate indifference. And examining the evidence in the light most favorable to Plaintiff and assuming that Boyd *did* receive the February 2 grievance, only thirteen days passed between Plaintiff penning it and then filing this lawsuit alleging that Boyd violated his constitutional rights. The singular statement of Plaintiff that he filed a grievance with Boyd, without a scintilla of evidence tending to show that Boyd acted or failed to act with a deliberate indifference towards Plaintiff's back troubles, falls well short of

preventing summary judgment on this claim. Because the Court grants Boyd summary judgment on the merits, it need not reach the issue of whether Boyd is entitled to immunity.

### C. Failure to Provide Shelter

Both Motions for Summary Judgment, filed by Harper and Johnston and by Boyd, respectively, request summary judgment on Plaintiff's failure-to-provide-adequate-shelter claim. The Constitution 'does not mandate comfortable prisons….'" *Farmer*, 511 U.S. at 832 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Conversely though, the Constitution does not "permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). This Amendment "imposes duties on…officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing *shelter*, and medical care…." *Id.* (emphasis added). "An Eighth Amendment claim contains both an objective and a subjective component," thereby mirroring the deliberate indifference analysis laid out above. *See Grissom v. Davis*, 55 F. App'x 756, 757 (6th Cir. 2003). "The objective component requires the plaintiff to demonstrate that he has been subjected to specific deprivations that are so serious that they deny him 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes*, 452 U.S. at 347). Second, "[t]he subjective component requires the plaintiff to demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs." *Id.* (citing *Farmer*, 511 U.S. at 834 and *Wilson*, 501 U.S. at 298-99).

The extent of Plaintiff averments in his Verified Complaint regarding the top bunk he was assigned are as follows: "I [Plaintiff] was given one thin mat and assigned a top bunk. I've put in several medical slips to see the Doctor so I could get medical treatment for my back, get

moved to a bottom bunk or to a medical cell." [DN 1, at 4-5.] He then avers more generally that "I have spent the last (13) thirteen months in severe pain and suffering…." [*Id.* at 5.] In their instant Motion and in response to these averments, Harper and Johnston argue that, "as medical personnel, [they] do not assign mats or bunks," and that Plaintiff "has admitted that he made no complaints of needing a different mat or lower bunk due to his alleged back injury." [DN 32-1, at 13.] In his Motion, Boyd merely adopts the argument presented by Harper and Johnston in their Motion. [*See* DN 35-1, at 12.] The Court will therefore view Harper and Johnston's Motion as it pertains to all three Defendants.

In order to avoid summary judgment, Plaintiff was required to produce more than a scintilla of evidence of two separate things: first, that the top bunk and mat to which he was assigned "subjected [him] to…deprivations that are so serious that they den[ied] him 'the minimal civilized measure of life's necessities.'" *See Grissom*, 55 F. App'x at 757 (quoting *Rhodes*, 452 U.S. at 347). Second, Plaintiff was required to show that Harper, Johnston, and/or Boyd "acted wantonly, with deliberate indifference to [Plaintiff's] serious needs." *Id.* Plaintiff has not done this, and so his claim must fail.

Regarding the "sufficiently serious deprivation" prong, the Court agrees with Harper and Johnston's characterization of the issue: Plaintiff "has neither alleged nor presented any evidence that the mat he received, nor the top bunk to which he was assigned, deprived him of basic human needs or caused him to suffer serious harm." [DN 32-1, at 13.] At best, Plaintiff has averred generally that he has been in severe pain during his confinement at the Christian County Jail. In his Verified Complaint he does not aver that the top bunk and/or mat exacerbated his back troubles, nor does he aver that the top bunk and/or mat caused him to suffer serious harm. Construing his Verified Complaint liberally, Plaintiff merely avers that he has well-documented,

chronic back problems, that these problems have persisted during his time of incarceration, and that the top bunk and mat did not help his back troubles. This, without actual evidence tending to show that the top bunk and the thin mat constituted a deprivation "so serious that they den[ied] him the minimal civilized measure of life's necessities," *Grissom*, 55 F. App'x at 757 (internal quotation marks omitted), is insufficient to satisfy this first prong. Indeed, in his February 2 grievance, lodged just thirteen days before this case was commenced, Plaintiff states as follows: "I don't know if lying on the hard surface of this bunk or climbing up and down out of the top bunk…aggravated my injuries…." [DN 32-31, at 1.] By Plaintiff's own hand, he admits uncertainty as to whether the bunk was worsening his back troubles immediately before filing this lawsuit.

However, even if Plaintiff had adduced evidence satisfying prong one, he has not satisfied prong two either, and so his claim necessarily fails. In particular, Plaintiff has not shown wantonness by any of the three Defendants. Indeed, in his Verified Complaint, Plaintiff avers that, "[b]ecause of the *negligence*" of Defendants, he has "spent the last (13) thirteen months in severe pain and suffering…." [DN 1, at 5 (emphasis added).] As discussed above, liability for deliberate indifference requires "more than mere negligence." *Burgess*, 735 F.3d at 476 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 835). But even setting aside Plaintiff's use of this term, no wantonness has been shown. With respect to Boyd, there is no evidence or any indication that he even knew about Plaintiff's top-bunk assignment until the February 2 grievance, filed by Plaintiff only thirteen days before this lawsuit. And Boyd argues that he never received this grievance. However, assuming Boyd did receive the grievance, Plaintiff states therein his uncertainty regarding whether the bunk was exacerbating his back troubles. [DN 23-1, at 16.] By Plaintiff's own admission, he was still uncertain at this juncture what effects the top bunk was

having on his back. It cannot logically follow, then, that Boyd, Harper, or Johnston acted wantonly and with deliberate indifference towards the bunk assignment.

As the Eighth Circuit has noted, "[t]he fact that plaintiffs suffered pain and discomfort is insufficient to prove this element. Plaintiffs have provided no evidence that any of the defendant prison officials knew of and disregarded an excessive risk to plaintiffs' health and safety," and therefore the plaintiffs could not make out an inadequate shelter claim. *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 84 (8th Cir. 1996). In *O'Leary*, one plaintiff "was required [for a time] to sleep on a 'cold' concrete slab located ten feet from the exterior door of the building when outside temperatures ranged from the twenties to the fifties," but "the inside ambient temperatures typically exceeded eighty degrees." *Id.* This plaintiff "fail[ed] to demonstrate a deprivation of shelter," as he *was* provided with food and water. *Id.*

Here, the alleged deprivation is not nearly as serious as in *O'Leary*. Additionally, Plaintiff has not averred that Harper, Johnston or Boyd are directly involved in the bunk-assignment process, and does not contend that Boyd knew of his assignment until thirteen days before this lawsuit started. Also, it is uncontested that Harper and Johnston have no part in the assignment process, and they contend they have no authority to make directives with respect to bunk assignments. Plaintiff does not refute Defendants' arguments pertaining to the top-bunk issue and, indeed, does not even mention this issue in his Responses to each of the two instant Motions. [*See* DN 36, DN 37.] Put simply, Plaintiff has not adduced evidence of a sufficiently serious deprivation with respect to his top bunk assignment, and further, he has adduced no evidence tending to show wantonness by Harper, Johnston, or Boyd. As such, summary judgment is appropriate for all three Defendants on this claim.

### D. Common Law Negligence Claim

The final argument made in both Harper and Johnston's Motion and Boyd's Motion is that Plaintiff cannot make out a prima facie case of negligence, and summary judgment is therefore appropriate. "In order to state a cause of action based on negligence, a plaintiff must establish a duty on the defendant, a breach of the duty, and a causal connection between the breach of the duty and an injury suffered by the plaintiff." *Lewis v. B & R Corp.*, 56 S.W.3d 432, 437 (Ky. Ct. App. 2001). In order to show the causal connection prong, a plaintiff must demonstrate both cause-in-fact and proximate, or legal, cause. *Id.* "Cause-in-fact involves the factual chain of events leading to the injury; whereas, [proximate] causation concerns the concepts of foreseeability and the public policy consideration on limiting the scope of responsibility for damages." *Id.* Notably, "[i]n Kentucky, the cause-in-fact component has been redefined as a 'substantial factor' element…." *Id.*

### 1. Harper & Johnston's Argument

Harper and Johnston, as a nurse and nurse practitioner, respectively, are medical professionals, and Plaintiff's Verified Complaint alleges medical negligence on their part in failing to adequately treat him, failing to refer him to a back specialist, and otherwise acting in a medically negligent manner with respect to his back troubles. [*See* DN 1, at 4-5.] In cases applying Kentucky law involving alleged medical negligence, "[e]xcept in limited factual circumstances…, the plaintiff…is required to present expert testimony that establishes (1) the standard of skill expected of a reasonably competent medical practitioner and (2) that the alleged negligence proximately caused the injury." *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006) (citing *Meador v. Arnold*, 94 S.W.2d 626, 631 (Ky. 1936), *Johnson v. Vaughn*, 370 S.W.2d 591, 596-97 (Ky. 1963), and *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982)). Where

required, this "opinion of the expert must be based 'on reasonable medical probability and not speculation or possibility.'" *Id.* (quoting *Sakler v. Anesthesiology Associates, P.S.C.*, 50 S.W.3d 210, 213 (Ky. Ct. App. 2001)). Thus, in order "[t]o survive a motion for summary judgment in a medical malpractice case in which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper." *Id.* (citing *Turner v. Reynolds*, 559 S.W.2d 740, 741-42 (Ky. Ct. App. 1977)).

In *Andrew*, the Kentucky Court of Appeals laid out the two exceptions to the general requirement of an expert opinion in order to avoid summary judgment:

> Kentucky consistently recognizes two exceptions to the expert witness rule in medical malpractice cases. *See Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992). Both exceptions involve the application of the *res ipsa loquitor* doctrine and permit the inference of negligence even in the absence of expert testimony. *See id.* at 654. One exception involves a situation in which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care…. [This is] illustrated by cases where the surgeon leaves a foreign object in the body or removes or injures an inappropriate part of the anatomy. The second occurs when medical experts may provide a sufficient foundation for *res ipsa loquitor* on more complex matters. *Id.* at 655 (quoting Prosser and Keeton on Torts, Sec. 39 (5th ed. 1984)). An example of the second exception would be the case in which the defendant doctor makes admissions of a technical character from which one could infer that he or she acted negligently. *See id.*

*Andrew*, 203 S.W.3d at 170-71. The Court finds that neither of these two exceptions applies in this case.

First, this case is not one where any layperson would be "competent to pass judgment and conclude from common experience that such things do not happen" if the defendant or defendants had exercised ordinary, reasonable care. *See id.* at 170. There is no indication from the record, and Plaintiff does not make any averments, that his back would be fine without Harper and Johnston's actions or inactions. Certainly, he avers that they negligently failed to provide him with adequate medical care, but that is insufficient as a matter of law here. "Whether

surgery is advisable for a particular patient is almost always an issue of medical judgment. Here, a layperson could not conclude" that Harper and/or Johnston's failure to refer Plaintiff for back surgery was negligent "without at least the proper evidentiary foundation of what" is required for back surgery to be necessary. *See Partin v. Tilford*, No. 5:13-cv-193, 2016 WL 3212248, at *2 (W.D. Ky. Jun. 7, 2016) (granting summary judgment in favor of defendant doctor on plaintiff's medical negligence claim because an expert was required to present evidence critical of defendant doctor's care in performing surgery). Second, and in this same vein, the determination of whether the correct medications were prescribed and the method in which they were administered, or whether surgery was a preferable option, "almost always requires an expert familiar with the procedure[s]…." *See id.* However, no such foundation has been laid by Plaintiff and "[t]he *res ipsa loquitor* exceptions to the medical expert requirement do not apply in this matter." *See id.* Thus, summary judgment in favor of Harper and Johnston is appropriate on Plaintiff's medical negligence claim.

## 2. Boyd's Argument

As Boyd is not a medical professional, nor does Plaintiff so allege, the Court does not construe Plaintiff's negligence claim against him as one for medical negligence. Rather, Plaintiff's negligence claim against Boyd falls under the standard, common law analysis, and would not require medical evidence from an expert. However, here too Plaintiff's claim of negligence must fail.

As explained above, a claim for common law negligence requires duty, breach, causation-in-fact, proximate causation, and resultant damages. *Lewis*, 56 S.W.3d at 437. "Duty may be established in several ways, but ultimately, '[t]he most important factor in determining whether a duty exists is foreseeability.'" *Boland-Maloney Lumber Co., Inc. v. Burnett*, 302

S.W.3d 680, 686 (Ky. Ct. App. 2009) (quoting David J. Leibson, 13 *Kentucky Practice: Tort Law* § 10.3, p. 113 (1995)). "Generally, each person 'owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury.'" *Id.* (quoting *Isaacs v. Smith*, 5 S.W.3d 500, 502 (Ky. 1999)). "Ordinary care" is typically described "as the degree of care which a reasonably prudent person would exercise under the same or similar circumstances." *Id.* (citing *T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526 (Ky. 2006)). It is unclear in this case precisely when Plaintiff's condition came to Boyd's attention. Plaintiff does not allege or aver, and the Court cannot find in the record, any indication that Boyd had an opportunity to become apprised of Plaintiff's back troubles at any time before February 2, 2017, thirteen days before this lawsuit was commenced. This was the date when Plaintiff filed a grievance addressed to Boyd. Of course, Boyd contends that he never received such a grievance. Taking as true the notion that Boyd assumed a legal duty on February 2, or on the date on which he received this grievance, Plaintiff has set forth no facts or evidence that would indicate that Boyd ever breached that duty.

Further, Plaintiff does not actually explain exactly what duty Boyd would have assumed under the circumstances. Supposing it would have been to act in a reasonably prudent manner to take reasonable steps to ensure Plaintiff was being treated adequately by the medical staff and/or that Plaintiff was provided with adequate sleeping materials (bunk and mat), Plaintiff does not aver this. The only averments Plaintiff makes regarding Boyd in his Verified Complaint is to say that his "rights have been blatantly violated by…Boyd," a legal conclusion to which this Court owes no deference," and that he "filed a grievance to Jailer Boyd to seek help and nothing was done." [*See* DN 1, at 5.] The pertinent section of that grievance is quoted above, and it expresses Plaintiff's ongoing uncertainty as to whether his back troubles have been exacerbated by his top

bunk assignment, states generally his medical history, and asks Boyd to assist in Plaintiff's quest to receive what he perceives to be more attentive medical treatment. All this was expressed to Boyd a mere thirteen days before the commencement of this lawsuit. There is no indication of whether this grievance was denied (again, Boyd rejects the notion that he received this grievance), or that Boyd patently refused to provide Plaintiff with any relief or harmed Plaintiff in any way. In short, Plaintiff presents no evidence that Boyd breach any duty of care he may have owed to Plaintiff before this lawsuit began.

Moreover, Plaintiff has failed to provide evidence of proximate causation. More specifically, Plaintiff has not produced any evidence that Boyd was the proximate cause of any damages sustained by Plaintiff. "Proximate causation captures the notion that, although conduct in breach of an established duty may be an actual but-for cause of the plaintiff['s] damages, it is nevertheless too attenuated from the damages in time, place, or foreseeability to reasonably impose liability upon the defendant." *Patton v. Bickford*, 529 S.W.3d 717, 730 (Ky. 2016). Proximate cause is "an issue of law to be decided by the courts." *Id.* The impetus of Plaintiff's claim for negligence is that there was a failure to adequately treat his back troubles during most of 2016 and into 2017 before this lawsuit was filed on February 15, 2017. It cannot be that Boyd was the proximate cause of Plaintiff's back troubles, or any alleged exacerbation of those problems, which appear to have occurred, by Plaintiff's own averments and filings, before the issue was ever brought to Boyd's attention. And in Plaintiff's Verified Complaint, he avers no different. As close as Plaintiff comes to this is averring that Boyd did nothing in the thirteen days between the filing of his grievance and the commencement of this lawsuit. Importantly though, he makes no averments and produces no evidence that he suffered damages as a result of this thirteen-day span. Rather, the meat of Plaintiff's argument is that he spent the better part of 2016

and beginning of 2017 in pain. Importantly though, Plaintiff's averments regarding this time period appear to relate directly to Harper and Johnston, and not to Boyd. In short, Plaintiff has not produced a scintilla of evidence tending to show that (1) Boyd breached any duty he may have owed to Plaintiff, nor (2) that Boyd was the proximate cause of any damages Plaintiff may have suffered. Summary judgment in favor of Boyd is appropriate on this claim.

### IV. Plaintiff's Motions for Summary Judgment

Plaintiff has also filed two Motions for Summary Judgment: one against Harper and Johnston, [DN 30], and one against Boyd. [DN 31.] However, because the Court has decided above that all three Defendants are entitled to summary judgment on all of Plaintiff's claims against them, these two Motions have been rendered moot. Because of this, the Court will dismiss them as such.

### V. Conclusion

For the reasons stated herein, **IT IS HEREBY ORDERED AS FOLLOWS:**

1) Harper and Johnston's Motion for Summary Judgment [DN 32] is **GRANTED.**

2) Boyd's Motion for Summary Judgment [DN 35] is **GRANTED.**

3) Plaintiff's Motions for Summary Judgment [DN 30, 31] are **DISMISSED AS MOOT.**

The Court will enter a separate Order and Judgment consistent with this Memorandum Opinion.

cc:      George Daniel, *pro se* plaintiff
Christian County Jail
410 W. Seventh St.
Hopkinsville, KY 42240

Counsel of Record